857 A.2d 1184

**David HOON, et al.**

v.

**LIGHTOLIER, a Division of Genlyte Thomas Group, L.L.C.**

**No. 2596, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Sept. 15, 2004.

650

Peter A. Muhic (Peter G. Rossi, Cozen O'Conner, on the brief), Philadelphia, PA and Allan A. Noble (Budow and Noble, P.C., on the brief), Bethesda, for Appellant.

Stephen E. Marshall (David S. Gray, Venable, Baetjer, and Howard L.L.P., on the brief), Baltimore, for Appellee.

Panel: SALMON, KRAUSER and BARBERA, JJ.

SALMON, J.

This is a products liability case by homeowners and their insurer against the manufacturer of a light fixture. The fixture, as one of its component parts, had a safety device that was designed to make the light blink on and off if the insulation in the immediate vicinity of the fixture got too hot. Alternating the electric current in this manner lowered the

temperature emitted by the lightbulb and warned users of the problem.

The fixture was accompanied by a label telling the installers of the fixture not to place insulation within three inches of it. The installer of the fixture failed to heed the warning. As a result, heat from the fixture was entrapped, and the insulation ignited, causing a devastating fire. To complicate matters, the safety device, because of either a manufacturing defect and/or negligent design, did not operate properly, and the lights never blinked. In litigation that followed, the owners of the home damaged by the fire contended that their property loss had two concurrent causes: (1) the failure of the installer of the light fixture to abide by the manufacturer's warning and (2) the failure of the safety device to prevent the fire due to its negligent manufacture and/or defective design.

Summary judgment was entered in the Circuit Court for Kent County in favor of the manufacturer of the light fixture. One of the grounds for summary judgment was that (purportedly) the sole proximate cause of the fire was the failure of the installer of the light fixture to heed the manufacturer's warning. The motions judge rejected the argument that the negligent manufacture and/or design of the safety device was a concurrent cause of the fire.

The major issue presented in this appeal is whether the motions judge was legally correct in granting summary judgment on the ground that the third party's failure to heed the manufacturer's warning was the sole proximate cause of the fire.

## I. *FACTUAL SUMMARY* [1]

Due to fire damages mentioned above, David and Texie Hoon ("the Hoons") and their insurer, Federal Insurance

---

1. Because the issue presented is whether the motions judge erred in granting summary judgment, the facts set forth in Part I of this opinion are recounted in the light most favorable to the parties that lost below, i.e., David and Texie Hoon ("the Hoons") and their insurer, Federal

Company, brought suit in the Circuit Court for Kent County against Lightolier, a Genlyte Thomas Company, LLC ("Lightolier"), and others.

Lightolier is the manufacturer of light fixtures, which were installed by Gede Installation, LLC ("Gede"), in the Chestertown, Maryland, residence of the Hoons. Lightolier affixed to each of the light fixtures a label containing the following words:

**WARNING–RISK OF FIRE**

**DO NOT INSTALL INSULATION WITHIN 3 INCHES OF FIXTURE SIDES OR WIRING COMPARTMENT NOR ABOVE FIXTURE IN SUCH A MANNER TO ENTRAP HEAT.**

A similar warning was enclosed in the box in which the light fixtures were shipped.

On each of the light fixtures installed by Gede were self-heating thermal protectors ("SHTPs"), which were intended to cycle, i.e., regulate the electric flow to the bulb so that the light would blink on and off if the area adjacent to the fixture got too hot. As designed by Lightolier, the SHTPs were located approximately three inches from the base of the light fixture. A purpose of the blinking light feature was to alert the consumer to the insulation problem (and/or the light-

---

Insurance Company. *See* Md. Rule 2–501(e). Some of those facts are disputed by the appellee-but not for summary judgment purposes.
   Our standard for reviewing grants of summary judgment is:
      We are asked to review the trial court's grant of summary judgment.... "It is essential to entry of a summary judgment ... that there be no genuine dispute as to any material fact and that the moving party be entitled to judgment as a matter of law." *White v. Friel,* 210 Md. 274, 285, 123 A.2d 303 (1956). Accordingly, the standard for appellate review is essentially whether the trial court was legally correct in granting summary judgment. *See Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067 (1996). Thus, we "review[ ] the same material from the record and decide[ ] the same legal issues as the [trial] court[.]" *Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied,* 351 Md. 286, 718 A.2d 234 (1998).
*Costello v. Nationwide Mut. Ins. Co.,* 143 Md.App. 403, 407, 795 A.2d 151 (2002) (some alterations in original).

fixture problem) so that corrective action could be taken. Another purpose of the blinking lights was to lower the temperature of the lightbulb and prevent overheating.

Attached to the fixture was another label, which read:

NOTICE—THERMALLY PROTECTED FIXTURE BLINKING LIGHT MAY INDICATE INSULATION TOO CLOSE TO FIXTURE OR IMPROPER LAMP.

When Gede installed the light fixture in the Hoons' residence, its agents placed the fixture flush against the insulation, thus allowing heat from the light fixture to become entrapped when the light was turned on. The parties agree that Gede acted negligently when it installed the fixture within three inches of the insulation.[2]

On November 2, 1998, the ceiling in the immediate vicinity of one of the light fixtures installed by Gede caught fire. The fire caused over $1.5 million in damages to the Hoons' residence. It is undisputed that one of the causes of the fire was the fact that insulation was placed too close to the light fixture. It is also undisputed, at least for purposes of this appeal, that the SHTPs that were part of the fixture did not function properly because the light in the fixture did not cycle when the heat started to rise, due to the thermal insulation being too far removed from the heat source, i.e., the fixture's bulb.

Prior to the fire—exactly when is not revealed in the record—two other Lightolier fixtures, which were located in the Hoons' kitchen, began to blink. The two fixtures were the same model as the one that did not cycle and was at the fire's point of origin. The Hoons and their agent recognized the significance of the blinking lights, accessed the area where these lights were installed, saw that they were covered in insulation in violation of the warnings on the fixtures, and

---

**2.** After suit was filed against, *inter alia*, Lightolier and Gede, the plaintiffs reached a settlement with Gede. The plaintiffs thereafter dismissed their claims against all remaining defendants except Lightolier.

removed the insulation. Nevertheless, neither the Hoons nor their agents checked the nearby fixture whose entrapped heat caused the fire.

Section N.410–68 of the National Electric Code[3] provides as follows:

**410–68. Temperature.** Fixtures shall be so constructed that adjacent combustible material will not be subject to temperatures in excess of 90°C (194°F).

Expert testimony produced by plaintiffs and considered by the motions court showed that, although the specific ignition temperature of the insulation varied with the rate of heating and the moisture content of the surrounding material, the ignition point of the fire at the Hoons' residence was between 350° and 500° Fahrenheit. The plaintiffs also proffered expert testimony to the motions court showing that Lightolier improperly designed the self-heating thermal protector, which allowed the fire to start. The design defect was that the heat sensor in the SHTPs was too far removed from the heat source (i.e., the bulb in the fixture); the improper location caused the SHTPs not to cycle as temperatures became excessive.[4]

---

3. The National Electric Code is a "model code promulgated by the National Fire Protection Association." *Edison Elect. Inst. v. Occupational Safety & Health Admin.*, 849 F.2d 611, 614 (C.A.D.C.1988).

4. According to Thomas W. Eager, one of plaintiffs' experts, there were "several factors that contributed to" the fire, *viz:*

   1. **Insulation of this Fixture:** This Lightolier fixture was not rated for insulation and should not have been insulated. The insulation was defectively installed and made the light fixture unreasonably dangerous.

   2. **Location of the Thermal Sensor:** The thermal sensor was not located at the hottest region of the light fixture. The presence of the insulation made this sensor ineffective in controlling over-temperature conditions. Lightolier's own testing shows that this improper installation of insulation was foreseeable. Under the circumstances, the location of the thermal sensor was unreasonably dangerous for this foreseeable improper installation. It was and is feasible to locate the thermal sensor more closely to the lamp holder.

Lightolier filed a motion for summary judgment and argued:

It is undisputed that ( [1] ) someone misused the fixture by installing insulation within three inches of the fixture and (2) by installing insulation too closely to the fixture, Gede ... acted contrary to warnings on the fixture, to warnings in the instruction booklet accompanying the fixture, and to common knowledge in the insulation and construction industry. According to [p]laintiffs, had Gede adhered to the warnings on the product, their damages would not have resulted. As a result, [p]laintiffs cannot prove that the Lightolier fixture was defective, unreasonably dangerous, or the proximate cause of their damages and Lightolier is entitled to summary judgment as a matter of law on the [p]laintiffs' claims or on its cross-claim against Gede.

In a supporting memorandum, Lightolier contended it "could not have foreseen [5] Gede's disregard of the unambiguous warnings provided on and with the [light] [f]ixture as a matter of law...." According to Lightolier, Gede's failure to adhere to "clear and unmistakable warnings" constituted "misuse that precludes recovery." Lightolier further argued: "Even if the SHTP[s] did not operate properly, plaintiffs may not recover from Lightolier because the installation of insulation within three inches of the fixture was a superseding and intervening cause of plaintiffs' damages."

The Hoons countered by pointing out, correctly, that Maryland law is clear that "there may be more than one proximate cause of an accident." According to the Hoons, the failure of the SHTPs to detect the excessive temperature conditions and cycle the lights was a concurrent cause of the fire inasmuch as that failure allowed the fixture to overheat and ignite the surrounding insulation.

---

**5.** In a virtually identical argument, Lightolier asserted, "[N]otwithstanding the fact that it designed the product with SHTPs, Lightolier could not foresee that users and consumers would ignore the warnings on the product and accompanying instruction booklet."

The motions judge granted summary judgment in favor of Lightolier as to plaintiffs' claims for strict liability in tort, negligence, and breach of warranty. The court explained its ruling as follows:

The court finds that the warnings placed on the light fixture and in the instructions were adequate. The court finds that the manufacturer of the light is entitled to believe that one installing the light together with any insulation that may be applied near it would heed the warnings. The failure to heed the warning in this case is the proximate cause of the fire. Further, the court finds that the plaintiffs were on further notice that there may be problems with the insulation and the cause of the fire by the fact that other fixtures operated properly causing them to blink and indicating problems. If there is a problem with one fixture with blown in insulation, the court finds that one is on notice that there may be problems with other fixtures and that they should be checked. The court finds that the subsequent malfunction or improper design of the self-heating thermal protection switch on this particular lamp ... that its failure to operate in this particular case does not provide the plaintiffs with another avenue for the jury to make a determination because the court finds that, for the reasons stated, that the Defendant Lightolier is entitled to summary judgment as a matter of law.

Immediately after the judge announced his decision, the following exchange occurred:

MR. ROSSI [counsel for appellants]: Your Honor, is that as to all causes—negligence, breach of warranty, and products?

THE COURT: I believe it is under the facts of this case, Mr. Rossi. The cause of the fire was the improper insulation.

MR. ROSSI: Are you finding, as a matter of law, that that was the sole cause, Your Honor?

THE COURT: I find it to be the proximate cause of this fire. I think that's all I need to determine. Okay?

The Hoons, along with their insurer, Federal Insurance Company, then filed this timely appeal.[6]

## II. *ANALYSIS*

### A.

██ As a general rule, we will only affirm the grant of summary judgment on the grounds relied upon by the motions judge. *See Lovelace v. Anderson*, 366 Md. 690, 695–96, 785 A.2d 726 (2001), and cases cited therein. Appellee does not urge us to deviate from that rule, and we shall not.

One of the reasons advanced by the motions judge for granting summary judgment was based on a "finding" by the court that because the Hoons knew, prior to the fire, that Gede had installed two light fixtures too close to the insulation in violation of Lightolier's warning, the Hoons had an obligation to check all other Lightolier light fixtures installed by Gede to see if a similar problem existed. Presumably, although the motions judge did not say so explicitly, he held the view that the failure to check all other light fixtures barred the plaintiffs' claims either because the Hoons assumed the risk of injury or because they were contributorily negligent as a matter of law (or both).

██ In its brief, Lightolier does not even argue that summary judgment can be affirmed on the foregoing basis. And, in any event, such an argument would have been futile. The label on the fixture advising the consumer of the significance of the blinking light, plus the Hoons' experience with the other two light fixtures, could have led reasonable persons in the Hoons' position to believe that if Gede installed the fixture too close to the insulation, the lights would blink. Here, it is undisputed that the lights in the fixture that started the fire never blinked. At most, a jury issue was raised as to whether

---

6. Federal Insurance Company is subrogated to the rights of the Hoons. Evidently, while this suit was pending in the trial court, Federal Insurance Company reimbursed the Hoons, in part at least, for the property damages suffered by them in the subject fire.

the plaintiffs' claims were barred by contributory negligence [7] on the part of the Hoons and/or by their voluntary assumption of a known risk.

## B.

We shall hold that the motions court also erred in granting summary judgment on its alternative ground, i.e., that the failure of Gede to heed the manufacturer's warning was, as a matter of law, the sole proximate cause of the fire.

In support of its no-proximate-cause argument, Lightolier stresses three facts. First, the warning label on the light fixture telling the installer not to place the fixture within three inches of insulation was clear and unambiguous. Second, there was no valid reason why Gede should have ignored the warning and installed the light fixture flush against the insulation, rather than at least three inches from it. Third, the fire would not have occurred if Gede had heeded Lightolier's warning. Although we agree that all three of these facts were established by Lightolier, it does not follow, as a matter of law, that Gede's failure to heed the warnings was the sole proximate cause of the fire.

Lightolier's central thesis is that there can be no liability on its part because Maryland recognizes a "heeding assumption," i.e., "a manufacturer is entitled to assume that its warnings will be obeyed." It is true that often a manufacturer can reasonably assume that its warnings will be obeyed. *See, e.g., Higgins v. E.I. DuPont De Nemours & Co., Inc.,* 671 F.Supp. 1063 (D.Md.1987), *aff'd,* 863 F.2d 1162 (4th Cir.1988) (discussed *infra*). But here, the appellants produced evidence from which it could be inferred, legitimately, that Lightolier *did not* assume its warning would be obeyed by installers. It evidently assumed the opposite when it installed the SHTPs as a part of the fixture and labeled its product so that the consumer would be led to believe that if a third-party

---

7. Contributory negligence will not, of course, bar appellants' strict-liability claim.

installer of the fixture failed to heed the warning, the lights would blink a warning. According to expert testimony produced by appellants, the dual purpose of the SHTPs was (1) to lower the fixture's temperature by making the flow of electricity to the bulb intermediate and (2) to warn the customer, by means of a blinking light, that the insulation has been installed too close to the fixture. Given the existence of such evidence, we can see no justification for applying a heeding assumption in this case.

Lightolier cites no cases, and we have found none, where *any* court has applied the heeding assumption when a manufacturer installs a defective safety device whose very purpose is to protect the user in case its warning is not heeded by a third party.

In support of its contention that Gede's failure to heed Lightolier's warning was, as a matter of law, the sole proximate cause of the fire, Lightolier places primary reliance on four cases, *viz: Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 495 A.2d 348 (1985); *Simpson v. Standard Container Co.*, 72 Md.App. 199, 527 A.2d 1337 (1987); *Halliday v. Sturm, Ruger & Co., Inc.*, 138 Md.App. 136, 770 A.2d 1072 (2001), *aff'd*, 368 Md. 186, 792 A.2d 1145 (2002); and *Higgins, supra*. We shall discuss those cases *seriatim*.

### 1. *Ellsworth v. Sherne Lingerie, Inc.*

#### 303 Md. 581 (1985)

The plaintiff in *Ellsworth*, while in her kitchen heating tea, wore a loosely fitting nightgown made of flammable material. 303 Md. at 588, 495 A.2d 348. When the plaintiff leaned over her stove, the nightgown ignited, and she was burned seriously. *Id.* The jury rendered a general verdict in favor of the sellers of the nightgown and the manufacturer of the textile used in it. *Id.* at 587–89, 495 A.2d 348. On appeal, the plaintiff/appellant claimed, *inter alia*, that the trial judge committed reversible error when he gave an instruction concerning misuse of the product. *Id.* at 581, 495 A.2d 348.

The *Ellsworth* Court held that the plaintiff had used "the nightgown for a foreseeable purpose," and therefore the trial judge erred in allowing the jury to consider whether the plaintiff had misused the product. *Id.* at 598, 495 A.2d 348. The Court said:

> We conclude that her manner of use of the nightgown, though possibly careless, was reasonably foreseeable as a matter of law. It certainly may be foreseen that wearing apparel, such as nightgowns and robes, will occasionally be worn inside out. It is also foreseeable that a loosely fitting gown will come into contact with sources of ignition in the environment where it may be expected to be worn, and particularly when worn in a kitchen and near a stove. Momentary inattention or carelessness on the part of the user, while it may constitute contributory negligence, does not add up to misuse of the product under these circumstances.

*Id.*

The *Ellsworth* Court recognized the difficulty in understanding the meaning of the term "misuse" in the context of product liability litigation, *viz:*

> Misuse has been defined as: a use not reasonably foreseeable; a use of the product in a manner which defendant could not reasonably foresee; a use of a product where it is handled in a way which the manufacturer could not have reasonably foreseen or expected in the normal and intended use of the product and the plaintiff could foresee an injury as the result of the unintended use; a use or handling so unusual that the average consumer could not reasonably expect the product to be designed and manufactured to withstand it—a use which the seller, therefore, need not anticipate and provide for; use of the product which constitutes wilful or reckless misconduct or an invitation of injury.

*Id.* at 594–95, 495 A.2d 348 (citations omitted).

In defining the term "misuse," the Court quoted, with approval, from the case of *Jones v. Menard,* 559 F.2d 1282 (5th Cir.1977), where the *Jones* Court said:

In inadequate warning cases misuse means that the seller had no duty to warn against unforeseeable uses of its products, while in design cases misuse means that the manufacturer had no duty to design a product so as to prevent injuries arising from unforeseeable uses of that product.... *In defective manufacture cases, however, misuse means that the injury was not caused by some inherent defect in the product but by the consumer's abnormal use of it. ...*

*Id.* at 1285 n. 4 (emphasis added).

The case *sub judice* is one where the warning was adequate. The factual issue presented was whether the SHTPs were negligently manufactured or defectively designed.

The *Ellsworth* Court also said:

Misuse of a product may also bar recovery where the misuse *is the sole proximate cause of damage, or where it is the intervening or superseding cause.*[8] For example, a high speed electric drill may be defective because a manufacturing defect causes it to short circuit and produce a shock during normal usage. A plaintiff who attaches a brush to that drill and in attempting to clean his teeth suffers injury to his mouth from the high speed of the brush will lose because his misuse is the sole cause of his misfortune, and the defect in the drill is not in any way related to the harm.

---

**8.** What constitutes a superseding cause was explained in *State ex rel. Schiller v. Hecht Co.*, 165 Md. 415, 421, 169 A. 311 (1933), as follows:

It is a superseding cause ... if it so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in the slightest degree, produces the injury. It is a responsible one, if it is the culpable act of a human being, who is legally responsible for such act. The defendant's negligence is not deemed the proximate cause of the injury, when the connection is thus actually broken by a responsible intervening cause. But the connection is not actually broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation.

*Ellsworth,* 303 Md. at 596, 495 A.2d 348 (footnote omitted) (emphasis added).

Lightolier does not contend that *Ellsworth* is factually analogous. It does contend, however, relying upon the drill being used as a toothbrush example, that the principles enunciated in *Ellsworth* preclude recovery by appellants. Lightolier argues:

> Even assuming the SHTP[s] did not work as intended, it was Gede's failure to follow the clear instructions provided with the [f]ixture that rendered the product a factor in [a]ppellants' damages. If Gede had complied with the provided warnings and instructions, the SHTP[s] on the [f]ixture would have been immaterial. *The misuse in this case is even more egregious than that discussed in Ellsworth: Gede was specifically instructed not to install insulation within three inches of the [f]ixture, received specific warnings of what would happen if it failed to follow these instructions, knew about this potential hazard due to industry-wide practices,* and nonetheless installed insulation within three inches of the [f]ixture. The allegation that the SHTP[s] did not work as intended does not change the fact that Lightolier was not obligated in the first instance to foresee that Gede would disregard its clear warnings.

(Citation omitted.) (Emphasis added.)

We fail to see how the "more egregious [misuse] than that discussed in *Ellsworth*" argument has validity. In the example of misuse set forth by the *Ellsworth* Court, the defect in the product (short circuit causing a shock during normal usage) had no effect on the injury the plaintiff suffered. The mouth injury to the consumer was caused by the plaintiff's misuse of the drill, i.e., by using the high-speed drill to clean teeth. Here, the defect in the product was the failure of the SHTPs to cycle when the fixture became too hot. It cannot be said that the defect in the SHTPs was in no way "related to the harm." Nothing in *Ellsworth* supports Lightolier's argument that Gede's failure to heed the manufacturer's warning

was either "the sole proximate cause of the fire or an intervening or superseding cause."

## 2. *Simpson v. Standard Container, Inc.*

### 72 Md.App. 199 (1987)

Ramesh Oza ("Mr.Oza") was a neighbor of four-year-old Lorenzo Simpson, Jr. Mr. Oza bought a gasoline can, which had a warning on the side admonishing the user not to store the can in living areas. 72 Md.App. at 206, 527 A.2d 1337. Another warning proclaimed, "Keep Out of Reach of Children." *Id.* at 207, 527 A.2d 1337.

Despite the warning, Mr. Oza put gas in the can and stored it in the basement of his house. *Id.* at 201, 527 A.2d 1337. Later, Lorenzo Simpson, Jr., and Mr. Oza's son, who was also four years old, were playing in Mr. Oza's basement. *Id.* at 202, 527 A.2d 1337. One of the four-year-olds removed the cap from the gasoline can and poured, or spilled, the contents on the basement floor. *Id.* The gas vapors ignited and Lorenzo Simpson, Jr., was severely burned. *Id.* Mr. Oza's son was killed. *Id.*

Lorenzo Simpson, Jr.'s, father, on behalf of his son, sued Standard Container Company, the manufacturer of the gasoline can, under theories of strict liability in tort, negligence, and breach of warranty. *Id.* at 202, 207, 527 A.2d 1337. The Simpsons contended that the gas container was defective because it was designed without a child-proof cap. *Id.* at 202, 527 A.2d 1337.

In *Simpson*, we rejected the plaintiff's strict-liability claim and said:

> In this case, the Ozas stored the gasoline can in the basement of their home, ignoring the admonitions on the sides of the can not to store it in living areas. The Ozas stored the can in an area which allowed two unsupervised four-year-olds access to the can. The gasoline can was not being used for the purpose and in a manner that was reasonably foreseeable. As a matter of law, there was a

misuse of this product and misuse negates the element of defect.

*Id.* at 206, 527 A.2d 1337.

Lightolier relies on the foregoing holding in *Simpson* in support of its contention that, because the warning that it gave was clear, it could not be reasonably foreseen that the warning would be disobeyed. Lightolier's "lack of foreseeability due to misuse" argument fails because it can be inferred that Lightolier *did,* in fact, foresee the exact misuse against which it warned. After all, the dual purpose of the SHTPs was to both protect and notify the user in case the fixture was placed too close to insulation by a third-party installer.

In *Madden & Owen on Products Liability,* the authors make the following observation, which we believe has merit:

*Failure to follow warnings and instructions.* A user's failure to follow a manufacturer's warnings of danger or instructions on safe use provides a special form of misuse which ordinarily should bar recovery whenever the danger from noncompliance is evident, the noncompliance is a substantial cause of the plaintiff's harm, *and there is no simple way or apparent reason for the manufacturer to design the danger out of the product.* Despite common knowledge (and hence foreseeability) that users often ignore warnings and instructions, many courts, and a few legislatures, have long had little sympathy with plaintiffs who are injured because they ignore warnings and instructions. Comment *j* to the *Restatement Second, Torts* § 402A states the rule quite clearly: "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in a defective condition, nor is it unreasonably dangerous." *Accordingly, if there was no practical way or reason for the manufacturer to design the danger away, courts have widely ruled that a user's failure to read or heed adequate instructions for safe use, sometimes characterized as "misuse," bars recovery.* It generally is both logical and fair to preclude recovery to a user who knowing-

ly ignores the admonitions of a manufacturer's full and fair warnings and instructions, for the user by so doing knowingly pushes the product unfairly beyond its stated safety capabilities. . . . Moreover, because of the foreseeability that warnings may be disregarded, *modern courts generally hold that manufacturers have an independent duty to design away dangers if there is a reasonable way to do so.*

DAVID G. OWEN ET AL., 2 MADDEN & OWEN ON PRODUCTS LIABILITY § 14:4 (3d ed.2000) (footnotes omitted) (emphasis added).

Based on the expert testimony proffered by appellants to the motions court, it cannot be said that there was "no practical way or reason for the manufacturer to design" away the dangers warned against. In fact, the manufacturer, albeit ineffectively, attempted "to design the danger away."

The *Simpson* Court also said:

Misuse is not the only ground upon which our decision rests. Comment j to Restatement (Second) of Torts § 402A, states:

"Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." The gasoline can had warnings written on two of the four sides proclaiming "Keep Out of Reach of Children" and "Do Not Store in Vehicle or Living Space." The appellees provided adequate warnings which went unheeded. The product was not in a defective condition nor was it unreasonably dangerous. The appellants failed to state a cause of action for strict products liability under Maryland Law.

72 Md.App. at 206–07, 527 A.2d 1337.

Comment j of *Restatement (Second) of Torts* does not justify sustaining the motions court's action.[9]

---

9. It is interesting to note that Comment *l* to section 2 of the *Restatement (Third) of Torts: Product Liability* (1998) rejects Comment *j* to section 402A of the *Restatement Second.* Comment *l* provides, in part:

Unlike *Simpson,* or any other case cited by Lightolier, the subject case involved a product that did not operate as designed-at least according to the expert testimony considered by the motions court. When a product does not operate as expected, Comment j is inapplicable. *See Moorhead v. The Carborundum Co.,* No. 461, 1983 WL 4345, 1983 Ohio App. LEXIS 15922 (Ohio Ct.App. Apr. 27, 1983).

Because a jury question was presented as to whether the SHTPs portion of the fixture was negligently manufactured or defectively designed, we hold that *Simpson,* to the extent that it relied upon Comment j of *Restatement (Second) of Torts,* is inapposite.

### 3. *Halliday v. Sturm, Ruger & Co., Inc.*

138 Md.App. 136 (2001), *aff'd,* 368
Md. 186, 792 A.2d 1145 (2002)

In *Halliday,* a three-year-old child fatally shot himself with a pistol manufactured by Sturm, Ruger & Company, Inc. ("Sturm"). *Id.* at 141, 770 A.2d 1072. The instruction manual provided to the consumer when the gun was sold stated: "Firearms should always be stored securely and unloaded, away from children and careless adults." *Id.* at 173, 770 A.2d 1072. In another part of the instruction manual, consumers were warned: "Firearms should be securely locked in racks or cabinets when not in use." *Id.* The father of the child did not store either the gun or the magazine in a locked box but rather placed the gun under his mattress and kept the loaded magazine on a bookshelf in the same room as the gun. *Id.* at 141, 770 A.2d 1072. The child found both the handgun and the magazine and loaded the gun. *Id.* As he played with the loaded pistol, it accidentally discharged, and he was killed. *Id.* The mother of the child brought suit against, *inter alia,* Sturm and alleged that the gun was defectively designed because it

---

[W]hen a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks.

failed to incorporate devices to prevent its use by young children. In *Halliday,* we held that there was sufficient evidence before the motions judge for him to "make a determination as to whether, in contemplation of controlling legal authority, the handgun sold . . . was in a defective, unreasonably dangerous condition and whether the improper storage of the handgun by [the father of the deceased three-year-old] constituted an unforeseeable misuse of the gun." *Id.* at 159, 770 A.2d 1072. We held that storage of the handgun under the circumstances, "i.e., within the reach of an unsupervised three-year old in violation of State law, constitutes misuse as a matter of law." *Id.* at 160, 770 A.2d 1072. We went on to say that,

> [e]ven were we to determine whether improper storage of the handgun was reasonably foreseeable is a factual matter, [the manufacturer] would nonetheless be entitled to summary judgment in the case at hand, given that Maryland law is that the risk-utility test is inapplicable to handguns which do not malfunction.

*Id.* at 160, 770 A.2d 1072.

In reaching the conclusion just quoted, we said, *inter alia,* "a handgun that has performed as expected cannot be said to have 'malfunctioned' within the ambit of *Restatement (Second) of Torts* § 402A, as construed by *Kelley* [v. *R.G. Industries, Inc.,* 304 Md. 124, 497 A.2d 1143 (1985)]." *Id.* at 164, 497 A.2d 1143. That portion of the *Halliday* case can give Lightolier no solace, because here the SHTPs portion of the fixture did not perform as expected.

In the alternative, we held in *Halliday* that, "even were we to conclude that [the manufacturer's] failure to include a child safety device on the handgun was a design defect, [the manufacturer] would still be entitled to summary judgment because of his misuse of the gun." *Id.* at 170, 770 A.2d 1072.

> The presence of the warnings transforms the foreseeability inquiry; the proper question is, could [the manufacturer] have reasonably foreseen that [the injured child's father] would not use the lockbox provided or that he would commit

acts in violation of the law or ignore clear warnings and instructions provided when he purchased the firearm?

*Id.* at 174, 770 A.2d 1072.

In *Halliday,* we answered the foreseeability question in the negative, by concluding, as a matter of law, that the behavior of the child's father was not reasonably foreseeable. *Id.* at 174, 770 A.2d 1072. Our holding in *Halliday,* insofar as it dealt with foreseeability, can be summed up in two sentences, *viz:* (1) Misuse occurs when the product in question is used in a manner not reasonably foreseeable by the seller. *Id.* at 170, 770 A.2d 1072. (2) If misuse occurs, that occurrence defeats a design-defect claim such as the one at issue (failure to incorporate device to prevent use by children). *Id.* Those two sentences are, in essence, a reiteration of the first ground relied upon by the *Simpson* Court. But here, as we noted in our analysis of *Simpson,* it cannot be said as a matter of law that the Hoons' use of the fixture too near to the insulation was unforeseeable in view of the fact that Lightolier evidently foresaw that very problem and advised the consumer, in effect, that if misuse occurred they would be warned by blinking lights.

The Court of Appeals granted *certiorari* in *Halliday* and affirmed our holding that the risk-utility test, which is used in determining whether a product is defective, does not apply in cases where the product does not malfunction. 368 Md. 186, 208–09, 792 A.2d 1145 (2002). The Court of Appeals did not discuss our alternative holding in *Halliday* that the misuse by the consumer was unforeseeable.

The Court of Appeals holding in *Halliday* does not aid Lightolier in any way. When the product does not operate as it was designed, the risk-utility test, not the consumer-expectation test, is to be utilized.[10] *Id.* at 197, 792 A.2d 1145.

---

**10.** The *Halliday* Court explained the consumer-expectation test as follows: " '[I]f it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it with the ordinary knowledge common to the community as to the product's

Here, the Lightolier fixture did not operate as designed because the SHTPs did not work at the time of the fire.

The Court of Appeals said in *Halliday:*

> The "risk-utility" test, which has been applied principally to alleged defects in the *design* of a product, regards a product as defective and unreasonably dangerous, for strict liability purposes, if the danger presented by the product outweighs its utility. Where this test is applied, the issue usually becomes whether a safer alternative design was feasible, for, if so, that would likely alter the balance by reducing the extent of the danger. Indeed, § 2 if the Restatement (Third) of Torts: Product Liability, which adopts this test for design defect cases, goes directly to that issue:

> "A product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller ... and the omission of the alternative design renders the product not reasonably safe."

*Id.* at 194, 792 A.2d 1145 (alteration in original).

Under the risk-utility test, if the Hoons' experts were believed, the risk of harm to the consumer would have been eliminated by a properly functioning SHTP system.

### 4. *Higgins v. E.I. DuPont De Nemours & Co., Inc.*

671   F.Supp. 1063 (1987), *aff'd,* 863 F.2d 1162 (1988)

*Higgins* was a duty-to-warn products-liability case. The defendant manufacturer (DuPont) sold Imron paint with labels affixed reading:

---

characteristics,' " then the product is "defectively dangerous." *Halli-day,* 368 Md. at 194, 792 A.2d 1145 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 99, at 698 (5th ed.1984)). In *Kelley, supra,* the Court said that the risk-utility test is "only applied when something goes wrong with a product." *Kelley,* 304 Md. at 138, 497 A.2d 1143.

FOR INDUSTRIAL USE ONLY by professional, trained personnel. Not for sale to or use by the general public. *Id.* at 1065.

"The accompanying label instructions and warnings required the use of a supplied-air respirator, eye protection, gloves, protective clothing, and adequate ventilation." *Id.* Some of the paint was sent to fire stations with labels attached, but others were distributed by the Baltimore City Fire Department to fire stations in unmarked cans. *Id.* at 1066. The plaintiffs (Higgins and Jones), two Baltimore City firemen, who were professional firemen, not professional painters, mixed the paint with their fingers while wearing their fire department work uniforms (which were taken home to be laundered). *Id.* at 1065. The plaintiffs then used the paint to touch up fire trucks. They later became parents of stillborn twins (Higgins) and twins who died shortly after birth (Jones). *Id.* The plaintiffs brought suit against DuPont (and others) to recover for the deaths of their children and fetuses who were alleged to have been fatally injured as a result of the teratogenic [11] effects of chemicals in the paint. *Id.*

In *Higgins*, the United States District Court, applying Maryland law, held:

[T]here were two kinds of Imron containers distributed to plaintiffs—marked and unmarked. This Court holds, first, as a matter of law, that the conduct of the Baltimore City Fire Department, in distributing the Imron constituents to the plaintiffs in marked and unmarked containers, was a misuse of the product by the Fire Department that was not reasonably foreseeable, in light of the labels' clear and conspicuous warning against the use of the product by amateur painters. With specific regard to Imron that reached the plaintiffs in containers with original labels, there is no dispute that, at all times, the labels warned

---

11. The word "teratogenasis" is a noun defined as: "the production of monsters or monstrous growths"; the word "teratogenic" is an adjective. WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 1464 (1989).

against nonprofessionals' use and, during the period here in question, gave clear warnings as to the need for comprehensive protection against respiratory, eye, and skin exposure. It was certainly not foreseeable to DuPont, as a matter of law, that the paint would be distributed by its purchasers to amateur painters and that if the paint reached the hands of amateurs, it would be applied in contravention of clear label warnings. In short, having warned users that they must be professional, trained paint applicators, DuPont acted in a way sufficient to warn the consuming public that the product was not for use by amateurs such as Higgins and Jones, and their emergence as users of the product was, thus, not reasonably foreseeable to DuPont. The chain of proximate causation between DuPont's manufacturing conduct and their injuries was therefore severed. To submit these issues to a jury could result in what the Court of Special Appeals of Maryland, taking its lead from the Court of Appeals, cautioned against in *Simpson*, 72 Md.App. at 206, 527 A.2d at 1341, *i.e.*, making DuPont a virtual insurer against injuries arising from its product, where it had taken adequate steps to restrict the use of the product to a limited class of persons, a class from which the plaintiffs are indisputably excluded.

*Id.* at 1066.

The foregoing holding in *Higgins*, standing alone, would appear to support Lightolier's position in this appeal, but the District Court went on to say:

The Court notes that the situation in this case is unlike that posed in *Khan v. Velsicol Chemical Corp.*, 711 S.W.2d 310 (Tex.App.-Dallas 1986), in which third parties were injured by a professional's misapplication of the product, which was labelled for professional use only. *See id.* at 316–17. Certainly, it is reasonably foreseeable that pesticides will have an effect upon persons in the vicinity of their use, and a *label warning restricting use of the pesticide to professional applicators only cannot as a matter of law be held adequate to bar recovery by third parties, in view of the obvious unpredictability of individual applicators' be-*

*havior.* In the instant case, the plaintiffs were not bystanders injured by the acts of trained, professional applicators.

*Id.* at 1066–67 (emphasis added).

■ We are in full accord with the portions of *Higgins* just quoted. Here, the Hoons were injured by a professional's (Gede's) misuse of Lightolier's product. Gede was an independent contractor, and as such, the Hoons were not responsible for Gede's errors. A label adequately warning the party who installs the light fixture of the danger of positioning the fixture too close to the insulation cannot be said, as a matter of law, to bar recovery of a third-party user (like the Hoons) in view of (1) the "obvious unpredictability" of the behavior of the installers and (2) the fact that the manufacturer led the users of the fixture to believe that if the installer disobeyed the warning, such disobedience would be brought to the consumer's attention by blinking lights.

### III. *CONCLUSION*

Taking the evidence in the light most favorable to the appellants, a jury could reasonably find that there were two concurrent proximate causes of the fire at the Hoon residence, *viz:* (1) Gede's negligence in failing to heed Lightolier's warning and (2) Lightolier's defective design (or negligent manufacture) of the SHTPs. We therefore hold that summary judgment was entered in error as to all three counts set forth in the appellants' complaint.

**JUDGMENT REVERSED;**

**COSTS TO BE PAID BY APPELLEE.**